ALTENBERND, Chief Judge.
Valerie and Jami Pagan appeal a summary final judgment that was entered in an unusual action for declaratory relief filed by Sarasota County Public Hospital Board (Hospital Board) and SMH Physician Services, Inc., d/b/a First Physicians Group of Sarasota (First Physicians Group). The Hospital Board and First Physicians Group sought a legal ruling that First Physicians Group and the doctors who practiced medicine through this nonprofit corporation were entitled to all the benefits of sovereign immunity. See § 768.28, Fla. Stat. (2001). The trial court’s judgment so rules as to the Pagans’ claim. We conclude that the Pagans have not demonstrated a basis that entitles them to receive a reversal of this judgment.
On the other hand, it is equally clear that the complex issues presented by this action for declaratory relief were not fully litigated and that the trial court did not intend the ruling to affect other persons who may be similarly situated to the Pagans. Accordingly, we decline to adopt the position argued by the Hospital Board and First Physicians Group that this ruling has broad application. Although the trial court’s order contains language broader than necessary to decide the dispute between the Pagans and First Physicians Group, we limit the ruling to those parties. Whether this nonprofit corporation and all of the forty to fifty doctors who practice in this group are entitled to governmental immunity in all cases is not an issue that can be resolved on this record.
I. THE CREATION OF FIRST PHYSICIANS GROUP
The Hospital Board, which is comprised of nine publicly elected members, is the governing board of the Sarasota County Public Hospital District. The Hospital Board was created by a special act of the legislature in 1949[1] at a time when private, for-profit corporations played little role in the construction of hospitals. It is undisputed that such hospital boards and their employees can possess the protections provided by sovereign or governmental immunity, subject to the limited waiver of sovereign immunity contained in section 768.28. See, e.g., Eldred v. N. Broward Hosp. Dist., 498 So.2d 911 (Fla.1986); Brown v. N. Broward Hosp. Dist., 521 So.2d 143 (Fla. 4th DCA 1988); Lower Fla. Keys Hosp. Dist. v. Littlejohn, 520 So.2d 56, 57 (Fla. 3d DCA 1988); see also Hillsborough County Hosp. Bd. v. Taylor, 546 So.2d 1055 (Fla.1989).
The Hospital Board’s enabling legislation provides that the Hospital Board is “authorized and empowered”:
(q) To the extent permitted by the Constitution and laws of this state, to establish, operate, or support subsidiaries and affiliates, either for profit or not for profit, to assist the hospital board in *259 fulfilling its declared public purpose of provision for the health care needs of the people of the hospital district.... The establishment, operation, or support of a subsidiary or affiliate corporation ... is hereby declared to be a public purpose and necessary for the preservation of the public health and for a public use and for the welfare of the hospital board and inhabitants of the hospital district.
Ch. 26468, Laws of Fla. (1949), as amended by ch. 86-373, § 1, Laws of Fla.
Based upon this provision, in 1994 the Hospital Board voted at a public meeting to create SMH Physician Services, Inc., as a nonprofit corporation. The Hospital Board’s creation of this nonprofit corporation was apparently justified on the theory that Sarasota County did not have an adequate supply of primary care physicians, that market forces within the private sector could not supply these physicians, and that governmental action was necessary to assure an adequate supply of primary care physicians for the people of Sarasota County.[2] Once incorporated, the corporation began providing medical services under the fictitious name of First Physicians Group.
First Physicians Group grew rapidly. By the time this lawsuit was filed in 2001, the group included more than forty physicians practicing in a wide range of specialities. It does not have a single location, but has doctors in about fifteen separate locations.[3] The group has apparently attracted a few doctors into the community, but our record suggests that most of the members of this group were doctors practicing in Sarasota County in 1994 who have simply merged their medical practices into this nonprofit corporation.
Although First Physicians Group is a nonprofit corporation, this is not a group of doctors that is serving primarily or only the poor. These doctors' appear to accept patients and receive payments from their patients and insurance companies just like any private clinic or professional association of physicians. The Hospital Board does not appear to control these doctors’ fees or the selection of their patients. The doctors in this group are only required to perform eighteen hours of community service each year. The corporation is a nonprofit corporation, but the physicians within the group earn large salaries established by complex production formulas similar to those used in private sector medical groups. In 2000, many of the physicians had incomes in excess of $200,000 and several had incomes in excess of $400,000.
The Hospital Board created this nonprofit corporation, and it has the power to dissolve it. It used government money to create this corporation. The Hospital Board elects the nine members of the corporation’s board, and a majority of those elected must be sitting Hospital Board members. The corporation actually runs at a loss and receives additional government funds annually to cover its expenses.[4] *260 The doctors in this group are not required to admit their patients to Sarasota Memorial Hospital. Their patients may be admitted to other hospitals in the community. If the Hospital Board decided to dissolve the corporation, the corporation’s remaining assets would revert to the Hospital Board.
II. THE SIGNIFICANCE OF GOVERNMENTAL IMMUNITY FOR FIRST PHYSICIANS GROUP, ITS DOCTORS, AND PATIENTS IN SARASOTA COUNTY
Since the creation of this nonprofit corporation, First Physicians Group has taken the position that it is a governmental entity and that the doctors within the group are government employees. Patients have disagreed. The outcome of this dispute has significant ramifications for medical malpractice lawsuits, for First Physicians Group, for the doctors it employs, and for their patients.
If these doctors do not have the benefit of governmental immunity, then their patients can pursue malpractice claims just like other patients bring claims against other doctors. The duty that a typical doctor owes to a patient is governed by the professional negligence standard, which generally requires that the doctor provide that level of care that a similar and reasonably careful physician would provide. See § 766.102(1), Fla. Stat. (2003); Fla. Std. Jury Instr. 4.2(a). On the other hand, if the doctors at First Physicians Group receive the benefit of governmental immunity, they can only be personally sued if they act “in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.” See § 768.28(9)(a), Fla. Stat. (2003).
For First Physicians Group the difference is equally significant. If it does not possess governmental immunity, it will be vicariously liable to its patients for the actions of its doctors just like any other private medical professional corporation. Its liability will not have any special limits or caps that are different from the rules that apply to for-profit medical professional corporations. If it is an instrumentality of a governmental agency, then it cannot be liable for a patient’s claim in excess of $100,000 unless the legislature orders it to pay the claim. See § 768.28(5), Fla. Stat. (2003). Likewise, claims against it will be controlled by the governmental presuit procedures, and attorneys representing patients against First Physicians Group will be limited to a twenty-five percent contingency fee. See § 768.28(6), (8), Fla. Stat. (2003).
It is understandable that First Physicians Group, the medical community, and patients within Sarasota County would wish to obtain a final legal decision establishing whether this method of creating a nonprofit corporation controlled by a government board is effective in allowing doctors to obtain immunity from malpractice suits without sacrificing the income of private practice. If this method works, then economically it may be logical for many local physicians to join the nonprofit group. It might also be logical for many local patients to seek health care in nearby counties where doctors remain personally and professionally responsible to the patients and liable for negligence based upon the usual, reasonable levels of patient care.
III. THE UNUSUAL ACTION FOR DECLARATORY RELIEF
Sovereign or governmental immunity is usually raised on a case-by-case basis as an affirmative defense by both the govern *261 mental agency and its employees. In this case, however, the Hospital Board and First Physicians Group decided to file a separate action for declaratory relief seeking a definitive ruling that they were entitled to sovereign immunity as a matter of law.
The complaint for declaratory relief was filed in June 2001 by the Hospital Board, First Physicians Group, and three of its physicians: Carlos F. Caballero, M.D., Kristen L. Paulus, M.D., and Michael M. Shroder, M.D. These plaintiffs sued Florida Physicians Insurance Corporation, Inc., which is the professional liability insurance company for First Physicians Group and its doctors. They also sued Valerie and Jami Pagan, Mary Colonese, and Audrey Aloise Roehrig.
It is clear that Florida Physicians Insurance Corporation was not truly an adverse party in this action. It has an exclusion in its insurance policy that limits its coverage in the event that the insured has governmental immunity. Thus, First Physicians Group was in the odd, if not unique, position of suing its insurance company to prove that the insurance company was not obligated to provide it with certain coverage. Florida Physicians Insurance Company apparently concluded that it would benefit if First Physicians Group and its doctors had limited liability. Thus, it never took an adversarial role in the trial court and has aligned itself with its insureds in this appeal.
The complaint for declaratory judgment described the remaining defendants as persons who had already filed medical malpractice suits against First Physicians Group and one or more of its doctors. The complaint admitted that First Physicians Group and the relevant doctors had already raised governmental immunity as a defense in the pending lawsuits but claimed a need to resolve the legal issue as to these parties in a separate proceeding.
In describing each of the defendants who were medical malpractice plaintiffs in separate pending lawsuits, the complaint alleged simply that Audrey Aloise Roehrig sued Dr. Caballero for “failing to use the appropriate standard of care in his treatment of’ her. As to Mary Colonese, the complaint with equal brevity claimed that she has sued Dr. Paulus. Finally, as to the Pagans, the complaint alleged that they sued Dr. Shroder for a failure to use the appropriate standard of care in his treatment of Valerie Pagan. No further detail about these malpractice claims was ever alleged or developed below. Because of the limited record in this case, we have no information whatsoever about the treatment of Mrs. Pagan by Dr. Shroder.
Two months after the complaint for declaratory relief was filed, Dr. Caballero voluntarily withdrew as a plaintiff. Thus, he ceased to be a party to the proceedings. The party who had sued him, Ms. Roehrig, initially moved to dismiss the action for declaratory relief. Later, in December 2001, Altom M. Maglio, Esquire, filed an answer on her behalf. Since that time, she has not participated in the lawsuit and the parties seem to have stopped serving her attorney. The order granting summary judgment, the final judgment, and the notice of appeal were not served on Ms. Roehrig or her lawyer. Thus, we can only assume from this record that she is either still an active party in the trial court and that no judgment has been entered against her, or that she was somehow dismissed from the action by documents that are not in our record.
At approximately the same time that Dr. Caballero withdrew from the lawsuit, the plaintiffs filed a notice of voluntary dismissal as to Mary Colonese. However, Dr. Paulus, who allegedly was her treating *262 physician, did not withdraw from the lawsuit. Following the dismissal of Mary Co-lonese, it is not obvious that Dr. Paulus has any legal need to resolve the question of immunity in this action.
As a result of these shifts in the action for declaratory relief, it soon became a lawsuit in which the Pagans’ claim was the only case truly in controversy and the lawsuit was structured only to obtain a resolution of the affirmative defense that First Physicians Group had earlier filed in the Pagans’ malpractice lawsuit. Although the Pagans moved to dismiss the complaint for declaratory relief on the ground that it was an improper lawsuit to resolve this affirmative defense, that motion was denied.[5]
Other parties who had pending claims against First Physicians Group apparently became aware of this lawsuit and were concerned that it could have a binding effect on their claims. Accordingly, separate attorneys representing Maria Torres, Judith Brandt, and Janie Sweet each filed motions to intervene and various documents and attachments supporting their motions.[6] In March 2002, these motions to intervene were denied in two orders that expressly declared that the interve-nors have no legal interest in the outcome of this declaratory judgment action. The trial court ordered and adjudged that “nothing adjudicated in this action will be binding or have any effect by way of res judicata, [or] collateral estoppel” on the in-tervenors. See § 86.091, Fla. Stat. (2001) (providing in declaratory judgment action that “all persons may be made parties who have or claim any interest which would be affected by the declaration. No declaration shall prejudice the rights of persons not parties to the proceedings”). Thus, it is clear that the trial court decided to resolve only the issue of the affirmative defense raised by First Physicians Group in the Pagans’ medical malpractice proceeding.
IV. THE SUMMARY JUDGMENT HEARING
The Hospital Board and First Physicians Group filed motions for summary judgment. The Pagans filed a competing motion for summary judgment. These motions were heard by the trial court in October 2002. The parties filed unusually limited materials prior to this summary judgment hearing. The record contains the affidavit of Della Shaw, who is the chief operating officer of First-Physicians Group. It also contains a deposition of Ms. Shaw taken in the medical malpractice suit filed by Mary Colonese, and another deposition taken in the medical malpractice suit filed by Maria Torres, one of the unsuccessful intervenors. It contains the affidavit of G. Duncan Finlay, M.D., the chief executive officer of Sarasota Memorial Hospital and the Sarasota Memorial Health Care System. It also contains his deposition, which had been taken for purposes of this action and numerous other malpractice lawsuits. Finally, it contains a short affidavit from Brad Lerner, the chief medical administrative officer for First Physicians' Group.
The record contains no pleadings or discovery material from the Pagans’ lawsuit. Thus, we are in the odd situation of affirming a ruling on an affirmative defense when we know virtually nothing about the lawsuit. There' are no depositions or affi *263 davits from any of the doctors involved in the treatment of Mrs. Pagan or any other patient. We know very little about how these doctors practice medicine or how their employment by a nonprofit corporation created by a governmental entity affects that practice.
Apparently, as a matter of litigation tactics, both sides decided that the controlling issue for purposes of summary judgment was whether the Hospital Board exercised sufficient control over First Physicians Group to be considered an instrumentality of the Hospital Board, and both sides believed that the materials in the record were sufficient to decide this issue in their favor. Thus, various other legal and public policy issues that have been argued on appeal were neither raised nor preserved in the trial court.
As to the specific issue argued at summary judgment, which revolved around whether the Hospital Board controlled First Physicians Group, the undisputed facts before the trial court showed that First Physicians Group was created by the Hospital Board, initially funded by the Hospital Board, and remains partially funded by it. The Hospital Board has the power to dissolve First Physicians Group and to claim any remaining assets upon dissolution. The nine members of First Physicians Group’s board of directors are elected by the Hospital Board and serve at the pleasure of the Hospital Board. Under the bylaws and articles of incorporation of First Physicians Group, a majority of its board of directors must be composed of sitting Hospital Board members. The chief executive officer of the Sarasota Memorial Health Care System is required to also be president of First Physician Group. Approximately forty physicians have entered into employment agreements with First Physicians Group that provide for full-time employment with First Physicians Group and prohibit the maintenance of private practices or the treatment of any patients other than patients of First Physicians Group.
At the hearing, the Hospital Board and First Physicians Group successfully argued that “the structure dictates the control” and that the Hospital Board had structural control of First Physicians Group and therefore First Physicians Group and its employees were “agencies” of the Hospital Board entitled to sovereign immunity. See, e.g., Prison Rehabilitative Indus. & Diversified Enters., Inc. v. Betterson, 648 So.2d 778 (Fla. 1st DCA 1994); Shands Teaching Hosp. & Clinics, Inc. v. Lee, 478 So.2d 77 (Fla. 1st DCA 1985). The Pagans similarly focused on the Hospital Board’s structural control of First Physicians Group as the decisive issue in determining whether First Physicians Group was a corporation primarily acting as an instrumentality or agency of the state, counties, or municipalities. See § 768.28(2). The Hospital Board argued that the doctors would have immunity if they were directly employed by the Hospital Board to work inside the hospital and that the creation of the nonprofit corporation did not alter this result.
At the conclusion of these arguments, the trial judge stated:
It seems to me that what the hospital is doing is. spreading around their sovereign immunity because of what is perceived to be the malpractice crisis.
However, in following the law, I mean, I’m not here for public purpose — public policy purpose, you know, that’s really not what I’m here for today, because I think it stinks. I think it’s wrong. I think it’s uncompetitive and I think the hospital — I think they ought to fix it by doing away with the independent corporation and just have these people as employees of the hospital. There would *264 be no question, you know, but anyway, I can’t tell them how to do their business.
In following the law, it appears that they followed what they have to do to create this subsidiary or affiliate, whatever you want to call it, and I’m going to grant summary judgment.
I find that they’re entitled to sovereign immunity, as much as I think it’s bad public policy, and I hope that an appellate court would consider all of those arguments.
The trial court then entered a summary judgment order that stated: “Plaintiffs’ Motion for Judgment is hereby granted. [First Physicians Group] and each of its employee physicians are entitled to sovereign immunity under Florida Statutes § 768.28.” This language was repeated in the final judgment.
In light of the limited arguments made below and thus preserved for appellate review, and in light of the existence of case law that supports the trial court’s conclusions based on those arguments, the Pagans have not demonstrated a basis for this court to reverse the final summary judgment in this case. See, e.g., Betterson, 648 So.2d 778. We therefore affirm the final summary judgment as to these parties.
We recognize that the language of the trial court’s orders was substantially broader than was necessary to resolve the dispute between First Physicians Group and one or two of its doctors, on one side, and the Pagans, on the other side. The language could be misread to have binding effect on the intervenors or other nonparties. However, the trial court clearly did not intend this, and section 86.091 does not permit it. See also Fasig v. Fla. Soc’y of Pathologists, 769 So.2d 1151, 1154 (Fla. 5th DCA 2000). Dr. Caballero affirmatively opted out of this ruling, and the great majority of doctors at First Physicians Group have neither been involved in these proceedings nor asserted a claim of sovereign immunity to limit their own liability to claims of wanton and willful misconduct. The trial court’s ruling is restricted to the claim between the Pagans and Dr. Michael M. Shroder and First Physicians Group as Dr. Shroder’s employer.
It appears that the Hospital Board, First Physicians Group, and the two physicians who remain in this litigation are seeking an appellate court opinion holding, as a matter of law, that First Physicians Group and its employees are entitled to sovereign immunity in any medical malpractice action. It is a long-standing rule of appellate jurisprudence that the appellate court should not undertake to resolve issues which, though of interest to the bench and bar, are not dispositive of the particular case before the court. Marion County Hosp. Dist. v. Akins, 435 So.2d 272, 273 (Fla. 1st DCA 1983). Accordingly, while we affirm the trial court’s ruling as it affects these parties on the basis of this limited record and based on the specific issues preserved for review by this court, the trial court was not authorized to make a broader legal holding, nor does this appellate court have a record or adequate arguments upon which it could announce any broader rule of law.
Affirmed.
SILBERMAN, J„ Concurs.
CANADY, J., Concurs in result only.

. Ch. 26468, Laws of Fla. (1949).

. Our record does not contain any studies or data that may have been generated to support these conclusions.

. Our record contains information from a website that provides more detailed information about this group. See http://www.first-physiciansgroup.com.

. The deposition of G. Duncan Finlay, M.D., the president and CEO of Sarasota Memorial Health Care System, indicates that the Hospital Board infused more than $4,000,000 into this nonprofit corporation in fiscal year 2001. Dr. Finlay explained that when- the physicians in this group were in private practice they generated income from laboratory work and x-rays. This work is now performed by other groups controlled by the Hospital Board. Apparently, the infusion of government money into this nonprofit corporation is designed to *260 offset or compensate the doctors for this loss in personal revenue.

. The Pagans have not challenged the denial of their motion to dismiss in this appeal. Accordingly, we do not rule upon the correctness of that order.

. Indeed, approximately one-third of our entire record is consumed by the filings of the parties who wished to intervene.